# United States District Court

EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ROBERT HODGES and | § | |
| DEBORAH HODGES | § | |
| | § | |
| | § | |
| V. | § | CASE NO. 4:12-CV-441 |
| | § | Judge Mazzant |
| WELLS FARGO BANK, N.A. | § | |

## MEMORANDUM OPINION

Pending before the Court is Defendant Wells Fargo Bank's ("Wells Fargo") Motion for Summary Judgment (Dkt. #65). The Court, having considered the relevant pleadings, finds that Defendant's Motion for Summary Judgment should be granted.

## BACKGROUND

On or about November 12, 2002, Plaintiffs Robert and Deborah Hodges executed a promissory note (the "Note") in the amount of $250,000 made payable to W.R. Starkey Mortgage, L.L.P. ("Starkey") for the property located at 28 Windsor Ridge, Frisco, Texas (the "Property"). Plaintiffs also executed a Deed of Trust, which granted a security interest in the Property to ensure repayment of the Note. Pursuant to the Note and Deed of Trust, Plaintiffs were obligated to make monthly payments on the first of each month in the amount of $1,458.93 beginning January 1, 2003. The Deed of Trust also required a monthly deposit of additional funds into an escrow account for payment of the taxes, hazard insurance and other escrow items owed for the Property, but did allow for waiver of the requirement for collection of monthly payments into escrow.

In conjunction with the execution of the Note and Deed of Trust, Plaintiffs executed the Escrow Waiver. Subject to certain conditions, the Escrow Waiver waived the Deed of Trust's requirement for the monthly deposit of funds into an escrow account to pay taxes and insurance for

the Property, and allowed Plaintiffs to pay the taxes and insurance directly to the proper authorities. The terms of the Escrow Waiver expressly reserved the lender's right to terminate the Escrow Waiver, establish an escrow account and increase Plaintiffs' monthly payments for the loan to pay escrow items if Plaintiffs failed to remit receipts indicating that the property taxes and insurance premiums had been paid. The Escrow Waiver further stated that its terms did not waive or modify the rights or remedies for default available under the Deed of Trust, including any rights or remedies arising from untimely or incomplete payment of the property taxes and insurance premiums owed for the Property.

Plaintiffs made payments under the Note consistently and without fail until 2012. In early 2005, Plaintiff Robert Hodges lost his job in the medical industry due to corporate downsizing. Plaintiff was out of work for three months. During that time, no payments were missed or late. Re-employed in April of 2005, payments continued on time, without interruption, and property taxes were kept current. In February 2006, the company Robert Hodges was working for filed bankruptcy following a rejection of their primary product by a major medical insurance payor. Plaintiff's job was eliminated and he was out of work for five months. By using savings, cashing in on a small stock portfolio and early 401(k) withdrawals resulting in penalties, payments of the primary mortgage to Wells Fargo Bank continued on time, and without interruption. Plaintiff was re-employed by a medical device start-up in July 2006, and payments continued uninterrupted. In August of 2007, that company eliminated eighty percent of the company's positions due to a lack of release of a new, flagship product for the company by the FDA. Plaintiff's job was eliminated again.

In February 2008, Plaintiffs used their remaining available savings to purchase a majority interest in an ongoing company in the construction industry. During that period, the monthly

2

mortgage payment continued to be paid on time without interruption. Shortly thereafter, due to the U.S. recession, the construction industry, particularly new residential, went in to a sharp decline. Plaintiffs' cash flow was greatly depleted and basic living expenses became dependant on early withdrawal of their 401(k) and depletion of any remaining savings. The company continued to suffer through 2009 and 2010. During the entire time, payments to Wells Fargo Bank continued uninterrupted and, with very few exceptions, on-time. The few exceptions were paid before the next month's note payment became due. During this time, Plaintiffs became unable to pay property taxes in a lump sum on two occasions.

In or around March 2009, Wells Fargo discovered that Plaintiffs had not paid the property taxes owed on the Property for tax year 2008 to the proper authorities by the payment deadline. The Collin County Tax Assessor and Collector (the "Collin Tax Office") and the Denton County Tax Assessor/Collector (the "Denton Tax Office") impose a January 31st deadline for payment of the prior year's property taxes, and assess penalties which gradually increase based on how long after the January 31st deadline the property tax payment is made. Wells Fargo notified Plaintiffs of the delinquent taxes, and, as authorized by the Escrow Waiver and Deed of Trust, advanced payment for the delinquent taxes and requisite penalties on or about March 31, 2009, in the amounts of $10,099.26 and $1,110.92, respectively. Plaintiffs reimbursed Wells Fargo for the delinquent taxes and penalties in April 2009, and Wells Fargo did not revoke the Escrow Waiver.

In or around March 2011, Wells Fargo discovered that Plaintiffs had not paid to the proper authorities the property taxes owed on the Property for tax year 2010. Wells Fargo sent delinquent tax notices to Plaintiffs on March 23, 2011, and April 5, 2011, requesting that they provide proof of their payment of the delinquent taxes. Plaintiffs did not provide proof of their payment of the

delinquent taxes, as demanded.

Wells Fargo then paid the delinquent taxes and penalties owed to the requisite taxing authorities for tax year 2010. As a result of Plaintiffs' failure to pay the 2010 taxes and provide proof of payment, Wells Fargo sent them a Notice of Payment of Taxes and Institution of Escrow Account to notify them that it revoked the Escrow Waiver and set up an escrow account for reimbursement of the taxes paid and for anticipated future tax payments. Wells Fargo informed Plaintiffs that their monthly payments would increase to repay the escrow advances for the property taxes and other escrow items and to fund the escrow account for future tax payments.

Plaintiffs also failed to provide proof of payment of the insurance coverage for the Property. Wells Fargo received cancellation notices from Plaintiffs' homeowners' insurance carrier for non-payment of premiums. Wells Fargo requested that Plaintiffs provide proof of their payment of the insurance premiums, but Plaintiffs failed to do so. As authorized by the Deed of Trust, Wells Fargo secured insurance on the Property in December 2010 for September 22, 2010, through September 22, 2011, in the amount of $11,319.79.

Wells Fargo warned Plaintiffs that their monthly mortgage payment would be increased to include the cost of the lender-placed insurance policy. Wells Fargo also warned Plaintiffs that the cost of the lender-placed insurance may be much higher than Plaintiffs would normally pay if they secured insurance of their choosing. Wells Fargo encouraged Plaintiffs to secure their own insurance, and informed Plaintiffs that it would cancel the lender-placed insurance policy once it received proof that Plaintiffs secured their own insurance for the Property.

Plaintiffs did not provide Wells Fargo with proof of insurance. Wells Fargo renewed the lender-placed insurance policy for September 22, 2011, through September 22, 2012, at a cost of

$9,898.89, and for September 22, 2012, through September 22, 2013, at a cost of $9,065.33. Prior to Wells Fargo's renewal of the lender-placed insurance policy, Wells Fargo notified Plaintiffs of the impending renewal and urged them to obtain their own insurance and provide Wells Fargo with proof of their payment of insurance for the Property. On April 4, 2012, Wells Fargo sent written notice to Plaintiffs reminding them that they had the right to secure insurance for the Property on their own, and encouraging them to do so since the lender-placed insurance is likely more expensive than a policy they could obtain on their own.

Plaintiffs failed to take advantage of the option to pay the escrow shortage caused by Wells Fargo's advance of funds for the 2010 delinquent property taxes and lender-placed insurance in full. In order to repay Wells Fargo for its advance of funds for the property taxes and lender-placed insurance for the Property, Wells Fargo spread the repayment for the funds advance over twelve months and increased Plaintiffs' monthly payment accordingly. Plaintiffs' monthly payment increased to $4,053.06 beginning May 1, 2011, and then increased to $6,673.63 as of August 1, 2011.

Plaintiffs were unable to make the increased monthly payments. Plaintiffs began to fall behind on their monthly payments beginning May 2011, and attempted to make partial payments of the total amount due in July 2011 and August 2011. Wells Fargo informed Plaintiffs that it would not accept partial payments, and that it would hold partial payment in an unapplied funds account until the payments were enough to make one full monthly payment or otherwise pay the outstanding amounts owed on the loan.

By letter dated October 23, 2011, Wells Fargo sent Plaintiffs separate notices by certified mail of the default of their payment obligations under the loan (the "2011 Notice of Default and

Intent to Accelerate Letter"), and demanded payment on or before November 22, 2011, of all outstanding and past-due amounts, or else Wells Fargo would accelerate the maturity of the Note. Plaintiffs did not make payment as demanded.

In light of Plaintiffs' payment difficulties, Wells Fargo sent Plaintiffs notices regarding possible loss mitigation options, including the option of applying for a loan modification. In late 2011, Plaintiffs sought to apply for a loan modification. Wells Fargo sent Plaintiffs a Home Affordable Modification Program ("HAMP") financial packet on November 7, 2011, and again on November 23, 2011. On December 16, 2011, Wells Fargo sent Plaintiffs notice in writing that their HAMP application was denied. As a result, the loan was removed from active loss mitigation.

Wells Fargo then resumed default and foreclosure processing. Wells Fargo directed its foreclosure counsel to schedule the Property for an April 3, 2012 foreclosure. Wells Fargo continued to make additional attempts to contact Plaintiffs regarding their default under the loan. Wells Fargo was unable to reach Plaintiffs to discuss the loan until March 2012. On March 19, 2012, Wells Fargo spoke to Plaintiffs and informed them of the documents they needed to submit in order for Wells Fargo to review the loan for modification. Wells Fargo further advised Plaintiffs of the scheduled April 3, 2012 foreclosure sale, and informed Plaintiffs that all documents required to review the loan for modification needed to be submitted to Wells Fargo at least ten days before the April 3, 2012 foreclosure. Wells Fargo also warned Plaintiffs during the March 19, 2012 call that it typically does not postpone foreclosure unless there is an approved modification.

Wells Fargo spoke to Plaintiffs on March 21, 2012, and stressed the urgency of Plaintiffs submitting the documents required to review the loan for modification as soon as possible in light of the pending foreclosure sale. Plaintiffs indicated that they would attempt to submit some of the

documents that day, but Plaintiffs failed to do so. Plaintiffs submitted some of the documents required for their loan modification application on April 2, 2012, which included a loan modification hardship letter dated March 19, 2012, and transcripts from the Internal Revenue Service ("IRS"), one day before the scheduled April 3, 2012 foreclosure. Wells Fargo informed Plaintiffs on April 2, 2012, that it was too late to review the loan for modification, and that the foreclosure would proceed.

Plaintiffs filed for Chapter 13 bankruptcy protection on April 3, 2012, in an attempt to save their Property. In addition, because Plaintiffs had not submitted all of the documents required to complete their loan modification review packet, the loan was not in active loss mitigation and was not assigned active loss mitigation status.

Once Plaintiffs' Chapter 13 bankruptcy case was dismissed, Wells Fargo directed its foreclosure counsel to reset the Property for a July 3, 2012 foreclosure, and resumed its attempts to contact Plaintiffs regarding potential loss mitigation options in light of their uncured default under the loan. Wells Fargo left multiple voicemail messages for Plaintiffs in May 2012. On or about May 28, 2012, Wells Fargo spoke to Plaintiffs and informed them that they would need to submit updated and additional documents to revive their loan modification application. Wells Fargo also spoke to Plaintiffs on May 30, 2012, and advised them of the July 3, 2012 foreclosure sale date, and again informed them that the scheduled foreclosure would not be postponed until there was an approved modification. Wells Fargo urged Plaintiffs to submit the documents required for the loan modification review as soon as possible.

On or about June 1, 2012, discussions resumed with Wells Fargo pertaining to the loan modification. Plaintiffs were informed that they had plenty of time, as there was no sale scheduled. Plaintiffs then began the "round robin" process of telephone calls in which they were being told

again they had the perfect scenario for a loan modification, but they could only speak with Ms. Ogden. Plaintiffs were further informed that Ms. Ogden was the only person who could enact any activity on the account. Plaintiffs notified Wells Fargo of their past experience with Ms. Ogden, her lack of timely response, and requested another primary contact. Plaintiffs did this repeatedly. On or about June 15, 2012, Plaintiffs were finally able to reach Ms. Ogden. She again went through all of the questions and informed Plaintiffs that her records showed no activity on the account since December of 2011. Plaintiffs asked her about all of the documents they had sent to her on Monday, April 2, 2012. Ms. Ogden stated that since she wasn't going to pursue postponement of the foreclosure at the time, she didn't add those documents to their system. She also stated that if Plaintiffs wanted to re-send their documents, she could restart the process. She also told Plaintiffs there was plenty of time for the modification and that once the documents were coming in, they could pursue a postponement of the sale date. Plaintiffs explained they were concerned that Wells Fargo had set another sale date but that the postponement opportunity was the first ounce of encouraging news they had ever received from her. Plaintiffs ended the call by agreeing to speak on Monday, June 18, 2012.

As of June 18, 2012, Wells Fargo spoke to Plaintiffs, and walked them through the loan modification application, and again advised Plaintiffs of the July 3, 2012 foreclosure sale date. Wells Fargo alerted Plaintiffs that there may not be enough time to review the loan for modification at this juncture.

On June 19, 2012, Plaintiffs spoke with Jessica, another loan modification specialist. Plaintiffs asked to speak with a manager or supervisor and were told that Ms. Odgen's manager was John Andrews. Jessica reported to him as well. Plaintiffs were told that Mr. Andrews was being

informed of the situation via e-mail and of their desire to have someone who could actually help them assigned to the account. On Thursday afternoon, June 21, 2012, Plaintiffs received a phone call from Steve Phillips ("Mr. Phillips") informing them he was taking over the account. Mr. Phillips told Plaintiffs that John Andrews, his boss, had received the messages but he was "too busy to call them back." Mr. Phillips said his being assigned to the file was essentially Mr. Andrews's response to Plaintiffs' calls. Steve Phillips once again informed Plaintiffs that there was no activity since December 2011, but acknowledged that he had some documents in-house. At that time he asked Plaintiffs to send him the following additional documents: (1) Additional individual pay stub for Robert Hodges; (2) Additional paycheck stub for Deborah Hodges; (3) Copy of 2011 Tax Extension Request Personal Taxes; (4) Copy of 2011 Tax Extension Request Business Taxes; (5) Form 4506T Tax Transcript Request; (6) 2010 Tax Return Personal; (7) 2010 Tax Return Business; and (8) YTD Company P&L.

Plaintiffs submitted documents to Wells Fargo by fax on June 19, 20, 21, 25, 26, and 27, 2012. On June 27, 2012, Wells Fargo informed Plaintiffs that there was not enough time to review the loan for modification prior to the scheduled July 3, 2012 foreclosure sale. Plaintiffs informed Wells Fargo that they would obtain an attorney to stop the July 3, 2012 sale.

Plaintiffs initiated this lawsuit and obtained a temporary restraining order to prevent the July 3, 2012 foreclosure sale. In light of the uncured default under the loan, Wells Fargo directed its foreclosure counsel to re-post the Property for foreclosure. The Property was posted for a March 5, 2013 sale, which did not proceed pursuant to this Court's entry of the Agreed Order and Scheduling of Injunction Hearing. The Property was then posted for an April 2, 2013 foreclosure sale. Although the loan had been accelerated, the Deed of Trust provided Plaintiffs with the opportunity to reinstate

the loan within five days of the scheduled foreclosure sale.  On March 26, 2013, Wells Fargo provided Plaintiffs with a reinstatement quote (the "Reinstatement Quote").   At the time of the Reinstatement Quote, Wells Fargo had advanced funds for payment of escrow items in the amount of $67,511.27.  The Reinstatement Quote required Plaintiffs to make a payment of $64,486.42 to reinstate the loan, and did not contemplate repayment of the entire escrow advance because an escrow analysis for the loan was not conducted after Plaintiffs filed for bankruptcy in April 2012, and Wells Fargo had not yet notified Plaintiffs of the additional amounts required to repay the escrow advance in full.   Plaintiffs paid $64,486.42 to Wells Fargo on March 28, 2013, to reinstate the loan prior to the April 2, 2013 foreclosure sale date.

Wells Fargo applied the reinstatement amount paid by Plaintiffs to principal and interest for payments missed in the amount of $30,637.53, escrow in the amount of $31,184.59, and late fees, expenses and other corporate advances in the amount of $2,492.30.  Upon application of the reinstatement amount, Wells Fargo waived a portion of the fees charged to the loan, and a total of $172 remaining from allocation of the reinstatement amount was placed into a suspense account for the loan.  Included in the portion of the reinstatement amount allocated to escrow were ten escrow payments in the amount of $943.33 for July 2011 through April 2012, and eleven escrow payments in the amount of $1,977.39 for May 2012 through March 2013.   An escrow shortage amount remained after Plaintiffs' reinstatement payment. Plaintiffs' April 2012 bankruptcy compounded the escrow shortage as there was no escrow collected on the loan while Plaintiffs were in bankruptcy, although Wells Fargo advanced funds for property taxes and insurance for the Property during that time.

Wells Fargo sent notice to Plaintiffs regarding the post-reinstatement escrow shortage on the

loan, and informed them of the options to pay the escrow shortage in full in a lump payment, or spread the repayment of the escrow shortage over twelve months. Because Plaintiffs failed to take advantage of the option to pay the escrow shortage in full, in order to repay Wells Fargo for its advance of funds for the property taxes and lender-placed insurance for the Property, Wells Fargo spread the repayment for the funds advance over twelve months, and increased Plaintiffs' monthly payment accordingly.

Plaintiffs' monthly payment increased to $7,191.25 beginning June 1, 2013. After further evaluation and removal of the lender-placed insurance for the loan, Wells Fargo conducted another analysis of the escrow account for the loan and determined the escrow shortage to be $34,487.35. Because Plaintiffs failed to pay the entire escrow shortage in full, the escrow shortage amount was spread over twelve months and the monthly payment for the loan was adjusted to $5,494.07 as of July 1, 2013.

Plaintiffs fell behind on their monthly payments once again. Plaintiffs again attempted to make partial payments of the total amount, which were held in suspense until the amounts equaled a total monthly payment. By letter dated June 21, 2013, Wells Fargo sent Plaintiffs separate notices by certified mail of the default of their payment obligations under the loan, and demanded payment on or before July 26, 2013, of all outstanding and past-due amounts, or else Wells Fargo would accelerate the maturity of the Note. Plaintiffs did not make payment as demanded. On or about September 23, 2013, funds were submitted by wire transfer in the amount of $234,130.71 pursuant to Plaintiffs' sale of the Property, which paid the loan in full.

Before Plaintiffs' payoff of the loan, the loan was consistently in default. As a result of the uncured default under the loan, Wells Fargo directed its foreclosure counsel, Barrett Daffin Frappier

Turner & Engel, LLP ("Barrett Daffin"), to initiate foreclosure proceedings regarding the Property on multiple occasions. The Property was scheduled to be foreclosed on April 3, 2012, July 3, 2012, March 5, 2013, and April 2, 2013.

In the Complaint, Plaintiffs challenge the July 3, 2012 foreclosure. After the filing of this lawsuit, Plaintiffs also sought injunctive relief from the Court to prevent Wells Fargo from foreclosing the Property on March 5, 2013, and April 2, 2013. In conjunction with the foreclosures scheduled for July 3, 2012, March 5, 2013, and April 2, 2013, Barrett Daffin sent Plaintiffs correspondence by certified U.S. mail notifying them that Wells Fargo was accelerating the loan balance, along with a notice that the Property was scheduled to be sold at foreclosure on July 3, 2012, March 5, 2013, and April 2, 2013. None of the scheduled foreclosures went forward, and the Property was never foreclosed.

On April 25, 2014, Defendant filed a motion for summary judgment (Dkt. #65). On June 13, 2014, Plaintiffs filed a response (Dkt. #75). On June 30, 2014, Defendant filed a reply (Dkt. #78).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut.*

*Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson,* 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co*., 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257.

### DISCUSSION AND ANALYSIS

Plaintiffs allege claims for breach of contract, anticipatory breach of contract, negligent misrepresentation, and for violations of the Texas Debt Collection Act ("TDCA"). Plaintiffs also seek an accounting and declaratory judgment, as well as actual and exemplary damages.

In their response, Plaintiffs expressly waive certain of their claims and allegations, and implicitly abandon others by failing to substantively challenge the arguments raised in the motion for summary judgment. Specifically, Plaintiffs expressly waived their claim for anticipatory breach of contract and their breach of contract claims based upon of violation of the Consent Judgment, violation of the Real Estate Settlement Procedures Act ("RESPA"), and waiver of the right to

13

accelerate and foreclose. Plaintiffs also expressly waived their claims under sections 392.301 and 392.303 of the TDCA, and waived by implication all of the grounds for their claims under sections 392.304(a)(8) and (a)(19), with the exception of their allegations related to loan modification discussions, as well as their claim under TDCA section 392.101, because they failed to challenge Defendant's summary judgment points in the motion seeking dismissal of the allegations and claims.

## Breach of Contract Claim

In their response, Plaintiffs withdrew their claim for waiver, violations of RESPA, and anticipatory breach of contract. Plaintiffs also agreed that even though Defendant violated the Consent Judgment, they concede that they do not have individual standing to enforce it. Plaintiffs only assert that Wells Fargo breached the Deed of Trust contract by not accurately applying Plaintiffs' payments to their account as required and by not giving Plaintiffs proper notices.

In order to establish a claim for breach of contract, a plaintiff must establish: (1) the existence of a valid, enforceable contract; (2) plaintiff performed or tendered performance; (3) defendant breached the contract; and (4) defendant's breach caused plaintiff's damages. *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

Plaintiffs assert that they have provided evidence to create a genuine issue of material fact to show that Defendant breached the Deed of Trust contract by misapplying payments to their account, and sending notices not in compliance with the Deed of Trust.

Defendant asserts that Plaintiffs now base their breach of contract claim on allegations that Wells Fargo breached the Deed of Trust by putting Plaintiffs' payments into suspense, and by failing to send Plaintiffs a notice of acceleration for the loan within the time required by the Deed of Trust. Defendant asserts that these allegations were raised for the first time in Plaintiffs' response and these

allegations are not before the Court.

The Court agrees with Defendant that Plaintiffs cannot assert new claims in a response to a motion for summary judgment. *Criner v. Texas—New Mexico Power Co.*, 470 F. App'x 364, 371 (5th Cir. 2012); *Jefferson v. Christus St. Joseph Hosp.*, 374 F. App'x 485, 492 (5th Cir. 2010). "A claim which is not raised in the complaint, but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005); *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990); *Higbie v. Kerry*, No. 3:11–CV–2636–L, 2013 WL 4603248, at *3 (N.D. Tex. Aug. 29, 2013). Plaintiffs never asserted in their Third Amended Complaint a claim for breach of contract based upon misapplication of payments and lack of notice. Therefore, the Court considers these claims waived and will not consider them. Summary judgment should be granted on these claims.

**Texas Debt Collection Act Claim**

In their response, Plaintiffs withdrew their claims under sections 392.301 and 392.303. Plaintiffs assert claims under sections 392.304(a)(8) and 392.304(a)(19). Defendant moves for summary judgment on both claims.

The TDCA prohibits debt collectors from using threats, coercion, or other wrongful practices in the collection of consumer debts. *See Brown v. Oaklawn Bank*, 718 S.W.2d 678, 680 (Tex. 1986). In order to state a claim under the TDCA, Plaintiffs must show: (1) the debt at issue is a consumer debt; (2) Defendant is a debt collector within the meaning of the TDCA; (3) Defendant committed a wrongful act in violation of the TDCA; (4) the wrongful act was committed against Plaintiffs; and (5) Plaintiffs were injured as a result of Defendant's wrongful act. *See* Tex. Fin. Code § 392.001, et seq.

The TDCA does not prevent a debt collector from "exercising or threatening to exercise a statutory or contractual right of seizure, repossession, or sale that does not require court proceedings." Tex. Fin. Code § 392.301(b)(3); *Sweet v. Wachovia Bank and Trust Company*, No. Civ.A. 3:03-CV-1212-R, 2004 WL 1238180, at *3 (N.D. Tex. Feb. 26, 2004). The TDCA prohibits a debt collector from "threatening to take an action prohibited by law." Tex. Fin. Code § 392.301(a)(8). The TDCA also prohibits a debt collector from "using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer." Tex. Fin. Code § 392.304(a)(19).

Section 392.304(a)(8) states, "in debt collection or obtaining information concerning a consumer, a debt collector may not use a fraudulent, deceptive, or misleading representation that ... misrepresent[s] the character, extent, or amount of a consumer debt." For a statement to constitute a misrepresentation under the TDCA, Defendant must have made a false or misleading assertion. *Reynolds v. Sw. Bell Tel., L.P.*, No. 2–05–356–CV, 2006 WL 1791606, at *7 (Tex. App.--Ft. Worth June 29, 2006, pet. denied). Section 392.304(a)(19) prohibits the use of false representations or deceptive means to collect a debt or obtain information concerning a consumer.

Plaintiffs' TDCA claims are premised on their allegations that Wells Fargo did the following: misrepresented the amounts owed on the loan; "represented that Plaintiffs were approved for a loan modification"; "represented that it would not foreclose"; "wrongfully accelerated and posted" the Property for foreclosure; "imposed wrongful charges (i.e. penalties, attorney fees, corporate advances and excessive force-placed insurance)"; and misrepresented the extent of the debt to Plaintiffs by "failing to allow Plaintiffs to pay the arrearage, as authorized by the Deed of Trust," but instead "demanded the entire amount due."

16

The summary judgment evidence establishes that Defendant provided Plaintiffs with the Reinstatement Quote, and accepted a payment of $64,486.62 from Plaintiffs to reinstate the loan, which was less than the total loan balance. The Court also agrees that Plaintiffs' allegation that Defendant "misrepresented the amounts owed on the Loan," is highly conclusory and unsubstantiated by any competent evidence. Plaintiffs each testified in their depositions that Wells Fargo did not attempt to collect any money from them that was not owed. They testified as follows:

> Q: Did you believe that Wells Fargo ever sought to collect any money from you that you didn't owe?
> A: Let me think about that for a minute. I would say no.
> - - - -
> Q: Is it your testimony that – well, let me ask this: Do you believe that Wells Fargo sought monies from you and Mr. Hodges that were not owed to Wells Fargo for the loan on the property?
> A: No.

Because Plaintiffs admit that Defendant never attempted to collect money from them that they did not owe for the loan or the Property, Plaintiffs have no evidence that Defendant misrepresented the amounts owed on the loan, and such an allegation cannot provide support for their claims.

Furthermore, Ms. Hodges admitted that she did not speak directly with Wells Fargo at any time, and further admitted that no representations were made to her directly by Wells Fargo regarding the loan or the Property. Therefore, Ms. Hodges cannot maintain any claims against Wells Fargo for violation of the TDCA based on misrepresentations regarding the loan or the Property.

Plaintiffs' allegations of representations related to loan modification discussions and postponing foreclosure do not constitute representations of the amount or character of a debt, nor do they constitute deceptive means to collect a debt. *Garza v. EMC Mortg.*, No. 3:11-cv-3504, 2014 WL 1016958, at *5 (N.D. Tex. Mar. 14, 2014); *Johnson v. Wells Fargo Bank, N.A.*, 999 F. Supp.

2d 919, 923 (N.D. Tex. 2014); *Burnette v. Wells Fargo Bank, N.A.*, No. 4:09-CV-370, 2011 WL 676955, at *7 (E.D. Tex. Jan. 27, 2011), *adopted by*, 2011 WL 675392 (E.D. Tex. Feb. 16, 2011); *Thomas v. EMC Mortg. Corp.*, 499 F. App'x 337, 343 (5th Cir. 2012). The discussions regarding potential postponement of foreclosure do not violate the TDCA. Plaintiffs' allegations do not support claims for violation of sections 392.304(a)(8) or (19). Plaintiffs offer no competent summary judgment evidence that Plaintiffs were ever approved for a loan modification. Plaintiffs had no right to loan modification. The record also reflects that Plaintiffs failed to timely submit the documents necessary to review the loan for modification.

The Court also agrees that Plaintiffs offer no evidence that Defendant did anything that was false or deceptive in attempting to collect the debt, or threatened an action prohibited by law. The Deed of Trust provides Defendant with a contractual right to foreclose on the Property in the event of a default. Representations related to a loan modification do not constitute an attempt to collect a debt. *See Singha v. BAC Home Loans Servicing, LP*, No. 4:10–CV–692, 2011 WL 7678684, at *7–8 (E.D. Tex. June 1, 2011).

The evidence in this case is clear that Plaintiffs were never promised that they qualified for a loan modification. The fact that Defendant encouraged Plaintiffs to apply for a loan modification is not a violation of the TDCA. The Court agrees that Defendant is entitled to summary judgment on Plaintiffs' TDCA claim. Plaintiffs' TDCA claim fails as a matter of law.

**Negligent Misrepresentation Claim**

Plaintiffs allege Defendant "represented that it would not foreclose on Plaintiffs' property during the loan modification process," but pursued foreclosure while Plaintiffs were purportedly being reviewed for a loan modification, and also "represented that Plaintiffs had been approved for

a loan modification." Plaintiffs also contend that Wells Fargo failed to use reasonable care in communicating the "correct status" of the loan by "telling Plaintiffs that they qualified for a loan modification, that [Wells Fargo does] not foreclose while a loan modification is under review, and that [Wells Fargo] had enough time to process Plaintiffs' documents." Plaintiffs claim that they were harmed by these alleged misrepresentations because Wells Fargo "posted their house for sale on July 3, 2012." In Texas, a claim for negligent misrepresentation has four elements:

> (1) the representation is made by a defendant in his course of business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information,; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). The type of misrepresentation contemplated is a statement of existing fact, not a promise of future conduct. *BCY Water Supply Corp. v. Residential Invs., Inc.*, 170 S.W.3d 596, 603 (Tex. App.--Tyler 2005, pet. denied) ("A promise to do or refrain from doing an act in the future is not actionable because it does not concern an existing fact").

Defendant asserts that the competent summary judgment evidence establishes that the loan was not in active loss mitigation and Plaintiffs were not being reviewed for a loan modification at the time Wells Fargo posted the Property for foreclosure in April 2012 or in July 2012, and, as a result, Wells Fargo could not have promised Plaintiffs that the loan was approved for modification. The Court agrees that Plaintiffs fail to provide competent summary judgment evidence to support this claim.

Defendant asserts that all of the allegations deal with conduct arising from the loan terms,

and injuries specifically related to the Deed of Trust, and because Plaintiffs are unable to establish that they suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a contract claim, their negligent misrepresentation claim is barred by the economic loss rule and cannot proceed. The Court agrees.

The economic loss rule generally precludes recovery in tort where a plaintiff's only injury is an economic loss to the subject of a contract. *Academy of Skills & Knowledge, Inc. v. Charter Schools, USA, Inc.*, 260 S.W.3d 529, 541 (Tex. App. – Tyler 2008, pet. denied) (citing *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007)); *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991)). "When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *UMLIC VP LLC v. T&M Sales and Env'tl Sys., Inc.*, 176 S.W.3d 595, 614 (Tex. App.–Corpus Christi, 2005, pet. denied) (citing *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)). The focus of the rule "is on determining whether the injury is to the subject of the contract itself." *Academy*, 260 S.W.3d at 541 (citing *Lamar Homes*, 242 S.W.3d at 12). The rule restricts contracting parties to contractual remedies for such economic losses, even when the breach might reasonably be viewed as a consequence of a contracting party's negligence. *Id.* (citing *Lamar Homes*, 242 S.W.3d at 12-13). "If the action depends entirely on pleading and proving the contract in order to establish a duty, the action remains one for breach of contract only, regardless of how it is framed by the pleadings." *OXY USA, Inc. v. Cook*, 127 S.W.3d 16, 20 (Tex. App. – Tyler 2003, pet. denied). Thus, in order for a tort duty to arise out of a contractual duty, i.e., negligent failure to perform a contract, the liability must arise independent of the fact that a contract exists between the parties; the defendant must breach a duty imposed by law rather than by the contract. *DeLanney*, 809 S.W.2d at 494.

"[W]hen a written contract exists, it is more difficult for a party to show reliance on subsequent oral representations." *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 651 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Generally, "negligent misrepresentation is a cause of action recognized in lieu of a breach of contract claim, not usually available where a contract was actually in force between the parties." *Airborne Freight Corp. Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 295 (Tex. App.—El Paso 1992, writ denied); *see Scherer v. Angell*, 253 S.W.3d 777, 781 (Tex. App.—Amarillo 2007, no. pet) (explaining that "there must be an independent injury, other than breach of contract, to support a negligent misrepresentation finding.").

Plaintiffs assert that the economic loss doctrine does not bar their negligent misrepresentation because Plaintiffs suffered injuries independent from any breach of contract. Plaintiffs assert that there is evidence of personal injuries, which are outside the subject matter of the contract and benefit-of-the-bargain damages.

The Court agrees with Defendant that Plaintiffs cannot demonstrate that Defendant owed them a duty that was independent of the Note and Deed of Trust. In this case, Plaintiffs' claims arise from claims dependent upon the existence of a contract. Any complaints by Plaintiffs relate to the parties' contractual relationship under the terms of the Note and Deed of Trust and cannot, as a matter of law, form the basis of a negligent misrepresentation claim. Moreover, Plaintiffs fail to offer sufficient evidence of mental anguish. Moreover, mental anguish and emotional distress damages are not recoverable under a negligent misrepresentation claim. *See Verdin v. Fed. Nat'l Mortg. Assn.*, 540 F. App'x 253, 255 (5th Cir. 2013); *Roberts v. Federal Home Loan Corp.*, No. H-11-3304, 2013 WL 1345222, at *6 (S.D. Tex. Mar. 30, 2013); *Wiley v. U.S. Bank, N.A.*, No. 3:11-cv-1241-B, 2012 WL 1945614, at *12 (N.D. Tex. May 30, 2012).

Plaintiffs have also failed to offer any summary judgment evidence of a representation of existing fact. Instead, Plaintiffs' allegations relate to future conduct, which is not actionable as a misrepresentation. *See Verdin*, 540 F. App'x at 255. Plaintiffs' allegations that Wells Fargo represented to them that they would be approved for a loan modification, and that it would not foreclose during the loan modification process, do not concern existing facts, but instead relate to future actions. In addition, any alleged oral promise to modify the loan or postpone foreclosure is barred by the statute of frauds, and can provide no support for Plaintiffs' claims. *See Martins v. BAC Home Loans Servicing, L.P.*, 722 F.3d 249, 256 (5th Cir. 2013). Conclusory allegations of reliance without more are insufficient to demonstrate how such reliance caused Plaintiffs to suffer pecuniary loss.

Plaintiffs' negligent misrepresentation claim fails as a matter of law, and summary judgment should be granted on this claim. *See Smith v. JP Morgan Chase Bank, N.A.*, 519 F. App'x 861, 865 (5th Cir. 2013); *Hurd v. BAC Home Loans Servicing, LP.*, 880 F. Supp. 2d 747, 764 (N.D. Tex. 2012).

**Declaratory and Other Equitable Relief**

Defendant also move for summary judgment on Plaintiffs' claims for declaratory relief and for an accounting. The federal Declaratory Judgment Act states, "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Federal courts have broad discretion to grant or refuse declaratory judgment. *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991). "Since its inception, the Declaratory Judgment Act has been understood to confer on

federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The Declaratory Judgment Act is "an authorization, not a command." *Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962). It gives federal courts the competence to declare rights, but does not impose a duty to do so. *Id.*

The Declaratory Judgment Act is a procedural device that creates no substantive rights, and requires the existence of a justiciable controversy. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-241 (1937); *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1179 (5th Cir. 1984). Thus, the Act provides no relief unless there is a justiciable controversy between the parties. The Fifth Circuit stated as follows:

> In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future. Based on the facts alleged, there must be a substantial and continuing controversy between two adverse parties. The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred. Additionally, the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury.
> Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects. To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future. Similar reasoning has been applied to suits for declaratory judgments.

*Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003) (citations and quotations omitted).

At the present time, there is no actual controversy between the parties that would allow for declaratory relief, and this claim should be denied. Furthermore, Plaintiffs are not entitled to these equitable remedies, including an accounting and injunctive relief, because they have no viable cause of action.

It is therefore **ORDERED** that Defendant Wells Fargo Bank's Motion for Summary Judgment (Dkt. #65) is hereby **GRANTED** and Plaintiffs' case is **DISMISSED** with prejudice.

**SIGNED this 3rd day of October, 2014.**

AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE